LODGED
OCT 1 4 2005

FILED
DEC 0 6 2005
UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____ RR Deputy

Michael W. Flanigan
WALTHER & FLANIGAN
1029 W. 3rd Ave. Suite 250
Anchorage, Alaska, 99501
Ph. 907- 279-9999
Fax 907-258-3804

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| DAVID AND MARGE BERG, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) A00-151 CV. (JWS) |
| NORGE CORPORATION, and its successors | ) |
| in interest, FEDDERS CORPORATION, | ) |
| MAGIC CHEF CORPORATION, and | ) |
| MAYTAG CORPORATION, | ) |
| | ) |
| Defendants, | ) |
| | ) |

**FOURTH AMENDED COMPLAINT**

Comes Now Plaintiffs, by and through counsel, and pursuant to the Pretrial Order entered on August 14, 2005, hereby file their Fourth Amended Complaint against Defendants, stating and and alleging as follows:

1. This suit is brought pursuant to AS 46.03.822 seeking contribution for investigation, remediation, monitoring expenses and reimbursement of state administrative expenses arising out of contaminated soils and ground waters as set forth herein, which were paid under state

PAGE 1 OF 12

145A

compulsion, pursuant to AS 46.03.822. This court has jurisdiction over this matter under 28 USC 1332, due to the diversity of citizenship of the parties.

    2. Plaintiffs are former residents of Anchorage, Alaska and former owners of the Boni-Park Laundry and Cleaners, located at 5477 East Northern Lights Blvd, from 1972-1978, and from 1980-1983.

    3. Between 1978 and 1980, the Laundry and Dry Cleaners were operated by Dave and Tsukiko Popham, who then resided in Anchorage, Alaska and operated the business under the name Alladin Cleaners.

    4. Prior to 1972, the Bergs purchased dry cleaning equipment from Norge Corporation, by and through Norge's authorized agents, acting within the course and scope of their authority, who installed the dry cleaning equipment the Bergs' Laundry and Dry Cleaners at 5477 E. Northern Lights Blvd. in Anchorage, Alaska on or about 1971-1972. As part of their agreement with Norge, the Bergs agreed to use a Norge design for the laundry facility, including Norge colors, and install signage identifying the facility as a "Norgetown" laundry facility, and submit to periodic inspections to confirm that the Bergs were operating the facility in accord with Norge recommended practices.

    5. On information and belief, the dry cleaning machines sold to the Bergs were manufactured by the Norge Corporation, company or division, or subsidiary, which was at that time operated, and controlled the Fedders Corporation (hereinafter Fedders), which had purchased the Norge Corporation (hereinafter Norge) and/or the stock and/or assets thereof from Borg Warner Corporation and had continued the Norge business enterprise of

WALTHER & FLANIGAN
1029 West 3rd Ave., Suite 250
Anchorage, Alaska 99501
Phone 907-279-9999
Fax 907-258-3804



manufacturing, selling, installing and servicing Norge dry cleaning equipment, under that same name, using the same key personnel, assets and business operations, while assuming all obligations necessary for the continuation of Norge's normal business operations and therefore was the successor in interest to the Norge Corporation, which was otherwise speedily liquidated, and therefore Fedders is liable for the costs of remediation and monitoring of the polluted site as set forth herein, caused by the design of the dry cleaning equipment which when used as intended, caused PCE pollution in the soils surrounding facilities utilizing such equipment.

      6. On information and belief, Fedders, a foreign corporation located in New Jersey, in accordance with their sales agreement to purchase the Norge business, agreed to assume all liabilities of the Norge enterprise, in any way arising from the past or future sale of Norge dry cleaning equipment.

      7. On information and belief, subsequent to the sale of the dry cleaning equipment to the Bergs, Fedders sold its interest in the Norge Corporation to Magic Chef, who continued the Norge business enterprise of manufacturing, selling, installing and servicing Norge dry cleaning equipment, under that same name, using the same key personnel, assets and business operations, while assuming all obligations necessary for the continuation of Norge's normal business operations and therefore was the successor in interest to the Fedders and Norge, which was otherwise speedily liquidated, and therefore Magic Chef is liable for the costs of remediation and monitoring of the polluted site as set forth herein, caused by the design of the



dry cleaning equipment which when used as intended, caused PCE pollution in the soils surrounding facilities utilizing such equipment.

8. The sale of Fedders interest in Norge to Magic Chef Corporation, was subject to an indemnity agreement with Fedders. Magic Chef Corporation (hereinafter Magic Chef) continued the Norge business enterprise of manufacturing, selling, installing and servicing Norge dry cleaning equipment, under that same name, and therefore was the successor in interest to Fedders and Norge, and therefore is liable for the costs of remediation and monitoring of the polluted site as set forth herein, caused by the design of the dry cleaning equipment which when used as intended, caused PCE pollution in the soils surrounding facilities utilizing such equipment, including the Boni-Park laundry facility, for the purposes of this suit.

9. On information and belief, subsequent to the sale of the dry cleaning equipment to the Bergs, Magic Chef was acquired by Maytag Corporation, which assumed all liabilities for the prior and future sale of Norge Dry Cleaning Equipment, subject to the indemnity agreement with Fedders. Maytag continued the Norge business enterprise of manufacturing, selling, installing and servicing Norge dry cleaning equipment, under that same name, and therefore was the successor in interest to Magic Chef, Fedders and Norge, and therefore is liable for the costs of remediation and monitoring of the polluted site as set forth herein, for the purposes of this suit.

10. On information and belief, Fedders has previously paid for the defense of Maytag and/or Magic Chef in previously filed pollution remediation contribution suits filed in other

PAGE 4 OF 12

jurisdictions, thereby supporting the continuing enterprise liability of Fedders and its successors, Magic Chef and Maytag.

11. During the times the dry cleaning equipment purchased from the Norge operated in the laundry facility at 5477 E. Northern Lights Blvd., Anchorage, Alaska, under the ownership of Plaintiffs, the Pophams, and subsequent owners, Janet and Richard Jaeger, a dry cleaning chemical, by the name of perchloroethylene (PCE), was utilized in the dry cleaning processes as per the recommendations of Norge and Fedders, the manufacturers and installers of the Norge dry cleaning equipment, and the distributor of the installation, operating and maintenance manuals that accompanied the equipment.

12. Although the Bergs, Pophams and Jaegers followed the manufacturers recommendations for operations and maintenance of the dry cleaning equipment, PCE entered the ground and groundwater around the Laundry facility, and migrated to ground and ground water underlying right of ways and intersection of the Boniface and Northern Lights streets in the vicinity of Boni-Park Laundry facility.

13. The underlying polluted ground and ground water, including but not limited to the Boniface and Northern Lights right or ways and intersection are property owned or possessed by the State of Alaska.

14. The cause of PCE entering the ground around the laundry facility and migrating to surrounding soils and ground water was due to the leakage of PCE through a PCE/water separator, which was an integral part of the dry cleaning equipment manufactured by Norge and/or Fedders, sold to the Bergs, and installed in their laundry Boni-Park laundry facility.

15. On information and belief, the dry cleaning equipment designed, manufactured, sold and installed by Norge/Fedders at the Boni-Park laundry facility utilized a "dry to dry" type of process. In this process, dry cleaning fluid was contained in a tank which pumped into the dry cleaning machines during the dry cleaning process and then was pumped back into the tank afterward. Thereafter, heat was applied and the remaining dry cleaning fluid evaporated and the fumes directed into a condenser. Water vapor accompanied the PCE vapors and the water/PCE separator was supposed to separate water from PCE. Water removed in this fashion was directed to a sewer through a drain line.

16. The installation and operating instructions prepared and distributed by Norge/Fedders, accompanying the dry cleaning equipment installed at Boni-Park, showed this drain line from the water/PCE separator to the Sewer drain, and Norge/Fedders authorized agents installed the line from the dry cleaning equipment to the sewer drain, pursuant to and in accordance with such installation instructions, when the Norge/Fedders dry cleaning equipment was installed at the Boni-Park laundry facility.

17. After the installation of the Norge/Fedders equipment, Norge/Fedders representatives visited Boni-Park laundry facilities to conduct inspections for a number of years and advised the Bergs on each such visit that their facility was being operated in accordance with Norge/Fedders instructions and recommendations.

18. On information and belief, the water/PCE separators in the dry cleaning equipment, sold to and installed at Plaintiff's Boni-Park laundry facility routinely failed in their purpose of successfully separating PCE and water and as a consequence PCE drained

into the sewer in addition to water. However, the manner in which this occurred was such that the operators of the laundry facility, including the Bergs, Pophams and Jaegers never knew that PCE was leaking into the sewer.

19. On information and belief, however, the dry cleaning machine manufacturing industry was made aware of this problem with Norge and other manufacturer's similar dry cleaning machine designs which incorporated a similar water/PCE separator design, by way of the State of Michigan, Dry Cleaning commission's prohibition of water/PCE separator drain lines being directed to sewer drains in the 1970s due to their own tests which demonstrated a high failure rate for such water/PCE separator devices.

20. On information and belief, despite this knowledge, the dry cleaning machine manufacturing industry, including Norge, Fedders, Magic Chef and Maytag, those manufacturers did not adequately warn the purchasers of such equipment of the problem or of the State of Michigan's prohibition and the reasons for that prohibition, even after completely enclosed dry cleaning machines were developed to avoid this problem in the late 1970s to early 1980s.

21. Upon information and belief, upon entering the sewer lines, PCE, a heavier than water chemical and a potent solvent, migrated through the seals of the sewer line into the surrounding soils and down to the water table, where it persists due to lower temperatures and a lack of reacting agents, such as oxygen.

22. Upon information and belief, an investigation of the sewer lines leading from the Boni-Park facility after the discovery of PCE soils in the vicinity, demonstrated high

WALTHER & FLANIGAN
1029 West 3rd Ave., Suite 250
Anchorage, Alaska 99501
Phone 907-279-9999
Fax 907-258-3804

concentrations of PCE in and around the sewer lines demonstrating that the source of the PCE contamination of soils in the vicinity around the Boni-Park facility and in the right of ways and intersection of the Boniface and Northern Lights streets near the Boni-Park facility was due to PCE flowing into sewer lines from the Boni-Park laundry facility.

23. In 1987-1988, State of Alaska in connection with a highway project detected the presence of PCE in soils in the Boniface and Northern Lights rights of way and intersection near the Boni-Park laundry facility at 5477 E. Northern Lights Blvd. This discovery led to a Alaska Department of Conservation Contamination Spill Number 88-2-1-077-1, and Alaska Department of Conservation(ADEC) case no. CS100.03. In 1991, the State of Alaska, by and through Alaska Department of Environmental Conservation, issued certain notices and letters identifying various individuals, businesses, and agencies and other entities as potentially responsible for the cleanup of contaminated soils near the site. The "PRP" letters were sent to the Bergs, Pophams, and Jaegers and others. The State of Alaska Notice to PRPs sought action, and payment by the PRPs to investigate the nature, extent of PCE contamination, and a plan to respond to PCE pollution, and removal or remediation of the contaminated soils. As part of the State of Alaska's effort to force compliance with its remediation demand, the State of Alaska filed liens on the property of the PRPs encumbering property and threatened to undertake remediation itself and sue for reimbursement if remediation was not undertaken. Since those notices, various PRPs have taken actions to create a pool of funds to respond to the State of Alaska's ADEC's demands for "clean up" of the site, including the Bergs and the present property owner, EEB.

PAGE 8 OF 12

24. The Plaintiffs sued their insurer, State Farm Ins. Co., to gain a contribution to the "pool funds" being used to pay for investigation, planning and remediation efforts. Such funds were first obtained on or about 1/30/98 by the Bergs for use with the "pool funds". Expenditures have been ongoing since that time out of the Berg's share of the "pool funds" to pay for investigation, planning, remediation efforts, and reimbursing the state for its administrative costs per applicable state statute. As part of the settlement with State Farm Insurance Co., Plaintiffs were assigned all State Farm's rights to seek contribution, indemnity or similar relief from other responsible parties under common or statutory law arising from their payment to the "pool funds" on or about 1/30/98.

25. Plaintiff also sued the Popham defendants in this suit previously and recovered funds from the Popham's insurer, State Farm, to contribute to the "pool funds".

26. Although Planitiff and other PRPs have diligently collected and applied "pool funds" funds for remediation of the site and monitoring the progress of the remediation for years, the persistence of the PCE contamination has continued and will continue into the foreseeable future requiring the continuous payment of funds to pay for continuing remediation and monitoring of the site. Collected "pool funds", which are approaching exhaustion, are not sufficient for this continuing endeavor.

27. Since the PRPs, in this case had no knowledge that the dry cleaning machines designed, manufactured, sold and installed by Norge/Fedders were causing PCE to enter the sewer system and thereby contaminating the surrounding ground and ground water, the PRPs, including Plaintiff are only technically or nominally at fault for the contamination of ground

and ground water and the resulting costs of remediation, monitoring and reimbursing state expenses.

28. Norge and Fedders on the other hand, having designed, manufactured, tested, sold, installed, and inspected dry cleaning machines, that when used as intended caused PCE contamination through the draining of PCE through the water separator into the sewer system, and therefore into the ground and ground waters, is 100% at fault for the contamination and costs of investigation, remediation, monitoring and reimbursement of state expenses, or as close to that percentage as provided by law, considering all equitable factors applicable to this case, especially given the fact that they were on notice of the State of Michigan prohibition against draining the water/PCE separator to the sewer due to PCE leakage into that drain line, and did not pass such information to the purchasers of the dry cleaning equipment.

29. As Norge and Fedders' successors in interest, Magic Chef and Maytag, as Magic Chef's successor in interest, are jointly liable for in the same amount and to the same extent as Norge and Fedders, especially since they too did not warn previous purchasers of the Norge equipment of the Michigan prohibition and the reasons for same.

30. Since the Defendants percentage of expenses paid for by Plaintiffs and other PRPs for investigation, remediation, monitoring and state administrative expenses related to the contaminated site set forth herein, greatly exceeds the amount they have paid to date, which is zero, Plaintiffs and other PRPs have paid more than their share of such costs, and therefore Plaintiff is entitled to seek contribution for same under AS 46.03.822.

WALTHER & FLANIGAN
1029 West 3rd Ave., Suite 250
Anchorage, Alaska 99501
Phone 907-279-9999
Fax 907-258-3804

Wherefore, Plaintiffs pray for a judgment against the all Defendants finding them liable, pursuant to AS 46.03.822, for their fair share of the costs for investigation, remediation, monitoring and state administrative expenses related to the contaminated site set forth herein, spent to date, which figure approximates or surpasses $1,000,000, with the Court issuing an order requiring Defendants to shoulder a continuing obligation to contribute the same percentage of all such future reasonable costs of investigation, remediation, monitoring and state administrative expenses related to the contaminated site set forth herein

Additionally Plaintiffs pray for the judgment to include prejudgment interest and the costs and fees of prosecuting this action.

DATED THIS 14th DAY OF OCTOBER, 2005.

WALTHER & FLANIGAN
ATTORNEYS FOR PLAINTIFF

By Michael W. Flanigan
ABA #7710114

WALTHER & FLANIGAN
1029 West 3rd Ave., Suite 250
Anchorage, Alaska 99501
Phone 907-279-9999
Fax 907-258-3804

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of FOURTH AMENDED COMPLAINT was served by mail this __14__ day of October, 2005, on:

Joseph R.D. Loescher
Spencer & Loescher, LLC
1326 Tacoma Ave. S., Suite 101
Tacoma, WA 98402

Seth Row
Christopher W. Angius
Holland & Knight LLP
2300 US Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204

_____
WALTHER & FLANIGAN

4201/Pld/FourthAmendedComplaint

WALTHER & FLANIGAN
1029 West 3rd Ave., Suite 250
Anchorage, Alaska 99501
Phone 907-279-9999
Fax 907-258-3804

PAGE 12 OF 12